1
2
3
4

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

7

8    UNITED STATES OF AMERICA,                    Case No.  3:23-cr-00473-CRB-1

9                        Plaintiff,

10         v.                                      **ORDER OF DETENTION**

11    MILTON JOEL VARELA ARTEAGA,

12                        Defendant.

13

14                                **INTRODUCTION**

15         The Court completed the detention hearing in this matter on Friday, January 12, 2024.  The

16    Defendant appeared before this Court on the Government's motion for detention.  The Defendant

17    was present, with the assistance of a Spanish interpreter, and was represented by counsel.  Having

18    conducted a detention hearing and considered the materials submitted by the Government, the

19    defense, and Pretrial Services, the Court ruled on the record at the hearing that the Government

20    has met its burden of proof and that the Defendant should be detained.  For the reasons stated

21    on the record at the hearing (incorporated herein by reference), and as further discussed herein,

22    the Court makes the following findings of fact and rulings as set forth below.  As such, this Order

23    supplements the Court's findings and verbal Order at the detention hearing and serves as written

24    Findings of Fact and a Statement of Reasons pursuant to 18 U.S.C. § 3142(i)(1).

25                                **BACKGROUND**

26         On December 13, 2023, Defendant Milton Joel Varela Arteaga (herein, "Defendant" or

27    "Arteaga") was charged by indictment with three counts of possession with intent to distribute 40

28    grams and more of a mixture and substance containing fentanyl (Counts Two, Three, and Four), in

United States District Court
Northern District of California

1   violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi).  *See* Dkt. 14.  At the arraignment in this matter,

2   the Government indicated its intention to move for detention.  The Government filed its

3   memorandum in support of its detention motion on December 20, 2023.  *See* Dkt. 24.

4            The detention hearing was initially set for December 19, 2023.  *See* Dkt. 16.  The

5   Government and Defendant stipulated to continue the detention hearing to December 21, 2023 in

6   order to allow Pretrial Services to complete a bail study.  *See* Dkts. 21 and 22 (Stipulation and

7   Order Granting Stipulation dated December 18, 2023).  Pretrial Services issued its first Pre-Bail

8   Report on December 20, 2023, which (in part) indicated that Pretrial Services had not yet had an

9   opportunity to interview the then-proposed surety, Ms. Gabriela Escorza (Defendant's significant

10  other and mother of one of his children).  *See* Dkt. 23.  The detention hearing was started on

11  December 21, 2023 but not completed because the defense requested further time to develop a

12  proposed release plan, which (at the time) would potentially include two alternative proposed

13  sureties.  *See* Dkt. 25.  At the defense's request, the detention hearing was further continued to

14  December 27, 2023 and held before the undersigned.  *See* Dkt. 26.

15           At the December 27 hearing, the first proposed surety, Ms. Escorza, was not present and

16  thus the Court was unable to query her as to her suitability as a surety.  At that hearing, the

17  defendant's alternative second proposed surety, Mr. Jeremy Willis (who is Ms. Escorza's cousin),

18  was also not present and, because Pretrial Services had not received his contact information

19  previously, had not yet been interviewed by Pretrial Services.  At the Defendant's request, the

20  detention hearing was further continued to January 4, 2024, in order to allow Pretrial Services time

21  to interview both Ms. Escorza and Mr. Willis and prepare Pre-Bail Reports.  Pretrial Services

22  submitted a further Pre-Bail Report on December 28, 2023 after interviewing Ms. Escorza.  *See*

23  Dkt. 27.  Pretrial Services submitted a Second Addendum Report on January 2, 204 after

24  interviewing Mr. Willis.  *See* Dkt. 29.  In that Second Addendum Report, Pretrial Services

25  concluded that Mr. Willis is not a suitable bail co-signer because of his lack of employment.  *Id.* at

26  3.  Subsequently, on January 2, 2024, defense counsel provided the contact information for a third

27  proposed surety, Mr. Henry Pena, to Pretrial Services.  *See* Dkt. 32 at 2.  On January 3, 2024,

28  Pretrial Services submitted a Third Addendum Report after interviewing Mr. Pena.  *Id.*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

On January 4, 2024, the Government submitted to the Court and defense counsel copies of two bank statements (for the period of September 20, 2023 to October 19, 2023 and the period of October 20, 2023 to November 17, 2023) for Ms. Escorza's bank account with Bank of America. The Government also submitted to the Court and defense counsel a copy of a Counter Deposit slip, dated November 6, 2023, for a deposit in the amount of $47,790 by Ms. Escorza into that same bank account. (As of the date of this Order of Detention, these bank account statements and deposit slip do not have docket numbers.)

At the next session of the detention hearing on January 4, 2024, neither the first or second proposed sureties, Ms. Escorza and Mr. Willis, were present. At that hearing, the defense withdrew Ms. Escorza as a proposed surety. The third proposed surety, Mr. Pena, was present. At that hearing, the defense proposed a fourth potential surety, Ms. Alisha Logsdon (Mr. Pena's significant other), who was not present, and the defense requested additional time for Pretrial Services to interview Ms. Logsdon. *See* Dkt. 33. The parties were further ordered to provide Pretrial Services with information relevant to Defendant's instance of a failure to appear and other instances of making appearances in a pending criminal matter in Alameda County Superior Court. On January 11, 2024, defense counsel provided to Pretrial Services a copy of the "Clerks Docket and Minutes" from the pending criminal proceeding in Superior Court for Alameda County against Defendant (Docket No. 22-CR-004796), which indicates that Defendant appeared at three pretrial hearings in that matter and failed to appear at a hearing on May 2, 2022. (As of the date of this Order of Detention, the copy of the "Clerks Docket and Minutes" are not filed in the docket of this case in this Court). Subsequently, on January 11, 2024, Pretrial Services submitted a Fifth Addendum Report after interviewing Ms. Logsdon, which provided updated information regarding Ms. Escorza as well as information on Defendant's appearances and failure to appear in the Alameda County Superior Court matter. *See* Dkt. 35.

With regard to Ms. Escorza, Pretrial Services reported as follows: "Pretrial Services called Ms. Escorza on January 11, 2024, and she informed she is currently living in Honduras with her children. When asked if she plans on returning to the United States, she reported she will only return if the defendant is released from custody." *Id.* at 3.

ORDER OF DETENTION                                    3

1   On January 11, 2024, the Government submitted a search warrant (with supporting

2   affidavit) to the Court, as well as to defense counsel and Pretrial Services.  At that time, the search

3   warrant package was under seal, however at the January 12, 2024 detention hearing, the

4   Government moved to unseal the search warrant package, which was unopposed by the

5   Defendant.  The search warrant was issued by this Court's duty judge on January 8, 2024, and is

6   titled "In the Matter of the Search of [sic] Application of the United States for a Search Warrant

7   for One Storage Unit for Investigation of 21 U.S.C. 841 and Other Offenses."  (As of the date of

8   this Order of Detention, there is no docket number currently for the search warrant.)  Because the

9   motion to unseal the search warrant application was granted without objection, this Order of

10   Detention is not filed under seal.

11   The application for the search warrant is supported by an affidavit of a Special Agent for

12   Homeland Security Investigations.  The target of the search warrant is a storage unit apparently

13   rented by Mr. Willis on behalf of Ms. Escorza, and that storage unit was (according to the

14   affidavit) being used to store narcotics.  According to the affidavit, Ms. Escorza and Defendant

15   Arteaga exchanged text messages on October 6, 2023 in which they discuss Arteaga's request for

16   a delivery of narcotics to his location in Oakland, California and Ms. Escorza's instructions to a

17   third-party juvenile to retrieve narcotics from a storage unit and deliver them to Arteaga at that

18   location in Oakland.

19   Because of the changing cast of potential sureties and evolving facts as the hearing and

20   interviews continued, Pretrial Services' recommendations similarly evolved as more information

21   was obtained.  *Compare* Dkt. 15 *with* Dkts. 34-35.  At the January 12, 2024 hearing, Pretrial

22   Services verbally modified their recommendation from their final Fifth Addendum Report,

23   specifically in response (at least in part) to the new fact that Ms. Escorza and Defendant's children

24   are now in Honduras:  In addition to the other recommended conditions in the Fifth Addendum

25   Report, Pretrial Services recommended that proposed co-sureties (Mr. Pena and Ms. Logsdon) co-

26   sign onto a secured bond in the amount of $75,000, or alternatively, an unsecured bond in the

27   amount of $150,000.  At the hearing, the defense objected to a secured bond, but represented (after

28   discussion) that all three proposed co-sureties (Mr. Willis, Mr. Pena, and Ms. Logsdon) would

United States District Court
Northern District of California

agree to co-sign on an unsecured bond in the amount of $150,000 (while preserving objection to Pretrial Services' increase of their recommended unsecured bond amount). The Government's arguments at the hearing focused on detention due to risk of flight or non-appearance (and thus opposed any of the co-sureties being appointed and also opposed the specifically proposed sureties as unsuitable). The Government also moved for detention based on danger to others or the community, as discussed further herein. Fundamentally, the Government opposed release on any conditions, as discussed in their memorandum and as argued at the hearing.

## DISCUSSION

In considering the Government's request for detention, the Court is guided by several general principles. First, at all times the Defendant is entitled to the presumption of innocence. Nothing that took place in the hearing or that is set forth herein is intended, or should be construed, to affect that presumption. Rather, the purpose of the hearing was to determine whether, notwithstanding that presumption of innocence, the Defendant should be detained pending trial.

Second, "[i]n our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act "carefully limits the circumstances under which detention may be sought to the most serious of crimes." *Id.* at 747 (citing 18 U.S.C. § 3142(f)). Under the Bail Reform Act, a Defendant must be released prior to trial unless a judicial officer finds that no conditions or combination of conditions exist which will "reasonably assure" the appearance of the Defendant (if the Government seeks detention based on risk of flight), or reasonably assure the safety of any other person in the community (if the Government seeks detention based on the defendant being a danger to the community). The Bail Reform Act requires that the least restrictive conditions be imposed that are necessary to provide those reasonable assurances. If the Court cannot find any conditions that will reasonably assure the appearance of the Defendant as required or the safety of the persons in the community, then the Court is required by the Act to order the Defendant held in custody.

The Government has the burden of proof by a preponderance of the evidence that no

1   condition or combination of conditions can reasonably assure the appearance of the Defendant as

2   required.  The Government has the burden of proof by clear and convincing evidence that no

3   condition or combination of conditions can reasonably assure the safety of any other person and

4   the community.  Because all Parties agree that this case involves the rebuttable presumption, the

5   burden of production is on the Defendant to rebut the presumption, although that is not necessarily

6   a heavy burden.  A presumption may be rebutted using information contained in a Pre-Trial

7   Services Report, for example.  Even in a case such as this involving a rebuttable presumption, the

8   burden of persuasion is always on the Government.

9         As noted, the detention hearing in this matter was first held on December 21, 2023 (after

10  being continued by stipulation between the Parties).  *See* Dkt. 25.  Per the defense's requests for

11  more time to allow a complete record to be presented regarding potential sureties, the detention

12  hearing was ultimately completed on January 12, 2024.  Indeed, at the hearing session on January

13  4, 2024, neither Party opposed or objected to completing the detention hearing on January 12,

14  2024.  In light of the unique circumstances regarding the number of proposed sureties and time

15  needed for the Parties to prepare for the hearing in light of the developing factual record (and the

16  time needed for Pretrial Services to interview and provide reports), the Court find that there was

17  good cause to conduct the detention hearing over multiple sessions to complete the hearing with

18  an adequate record and to allow the Parties necessary time to prepare.  *See* 18 U.S.C. § 3142(f)

19  ("The person may be detained pending completion of the hearing. The hearing may be reopened,

20  before or after a determination by the judicial officer, at any time before trial if the judicial officer

21  finds that information exists that was not known to the movant at the time of the hearing and that

22  has a material bearing on the issue whether there are conditions of release that will reasonably

23  assure the appearance of such person as required and the safety of any other person and the

24  community.").

25        Applying the applicable legal standards and principles, and based upon the information

26  contained in the Pretrial Services Report, the evidence presented by the Parties including at the

27  hearing, and the arguments of counsel, the Court finds as follows:

28        This case involves a rebuttable presumption that no condition or combination of conditions

United States District Court
Northern District of California

1   will reasonably assure the  appearance of the person as required and the safety of the community

2   pursuant to 18 U.S.C. § 3142(e)(3).  Specifically, Defendant is charged with an offense for which

3   a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances

4   Act, 21 U.S.C. §§ 801 *et seq*.  The charges against the Defendant carry a mandatory minimum

5   term of imprisonment of five years and the Sentencing Guidelines range is approximately ten

6   years.  Further, the charges against the Defendant involve narcotics offenses occurring on May 11,

7   2023, June 28, 2023, and November 29, 2023, as detailed in the Indictment.  For the reasons stated

8   herein as well as on the record, the Defense has not overcome or rebutted the presumption that no

9   condition or combination of conditions will reasonably assure the  appearance of Defendant

10  Arteaga.

11         The Government argues for detention first because there are no conditions that would

12  reasonably assure Defendant's appearance based on the facts in the record.  *See* 18 U.S.C. § 3142(g).

13  In analyzing this issue, the Court has reviewed the statutory factors under § 3142(g) and applicable

14  case law, and find as follows:

15         With regard to the nature and circumstances of the offenses charged, the Defendant faces a

16  potential sentence range (and a potential maximum sentence) of such length and severity that the

17  Defendant has an incentive to flee.  As noted in the Indictment, the Defendant (or his residence or

18  automobile) were searched several times, and at each instance the Defendant was found with large

19  amounts of cash (on May 11, 2023: $70,000; on June 28, 2023: $12,000; and on November 29,

20  2023: $13,000).  He has thus demonstrated a repeated ability to obtain significant amounts of cash

21  in short periods of time, and such apparently easy access to cash would provide the means to flee.

22         With regard to family ties, the Court finds that this factor leans substantially in finding no

23  conditions of release would reasonably assure the Defendant's appearance.  The Defendant's mother

24  (with whom he maintains weekly contact) and siblings (two brothers and four sisters, with whom

25  he maintains monthly contact) are all residents of Honduras.  *See* Dkt. 23 at 1.  Defendant has two

26  children from a previous relationship who reside in Honduras with their mother, and he provides

27  voluntary child support for his children.  *See id.* at 2.

28         Further, and most significant, Ms. Escorza (Defendant's current partner and significant other

United States District Court
Northern District of California

for the last five or six years) has fled to Honduras recently (during the pendency of this matter) and now resides in Honduras with the daughter she shares with Defendant Arteaga.  *See* Dkt. 35 at 3. Ms. Escorza has an older child (a son) from a prior relationship whom she also brought with her when she fled to Honduras.  At the hearing, the proposed sureties (particularly Mr. Pena) all testified that Defendant Arteaga treats and refers to this older child as his own son.  Indeed, Mr. Pena testified with great emotional sincerity that the reason he was volunteering to be a co-signer and surety was because he has observed over the last several years how devoted and connected Defendant Arteaga is to the children he shares with Ms. Escorza.  Mr. Pena thus testified that he wants to do whatever he can to support Defendant Arteaga's desire to reunify with his family, because Mr. Pena is so touched by the depth of Defendant Arteaga's commitment to being with the children he shares with Ms. Escorza.  The fact that those children are now in Honduras thus gives Defendant Arteaga substantial motive to flee, given the universally recognized depth of feelings and close relationship he has with his children.  In addition, Ms. Escorza's statement to Pretrial Services indicates no present intention on her part to return to the United States, and thus for that additional reason, Defendant has incentive and motivation to flee in order to be with her.

The Court finds that Ms. Escorza's statement that she would consider returning to the United States "if" Defendant Arteaga were released to be a troubling indicator of potential bad faith on her part.  First, that statement is not binding on Ms. Escorza in any way and there is no reasonable basis for the Court to make a decision to release a defendant based on a hypothetical statement by a significant other.  Second, her conditioning her hypothetical return to the United States on whether or not Defendant is released indicates a lack of willingness to support Defendant with visits and court appearances should he be detained, further undercutting the credibility that she would actually return.

Third, the Court finds that Ms. Escorza's statement about whether she would return to the United States is not credible given (a) her apparent involvement in the storing and/or delivery of narcotics (as averred in the search warrant affidavit), (b) her apparent involvement in depositing and wire transferring suspiciously large amounts of money through her bank account (amounts far larger than the salary she earned as a house cleaner would account for), and (c) the timing of her relocation

to Honduras.  Finally, because Ms. Escorza knew she was speaking with Pretrial Services and knew that there was previously interest in her serving a surety, the Court finds that Ms. Escorza made her statement about returning to the United States "if" Defendant Arteaga were released to have been made either to attempt to bargain in some way for Defendant's release on conditions or, worse, to fraudulently induce this Court to release Defendant Arteaga when (as discussed above) she has no actual intention to return.  There is no information in the record as to why Ms. Escorza went to Honduras, and the Court finds based on the information in the record that Ms. Escorza likely fled to Honduras in order to avoid the possibility of her own indictment or to avoid being involved in a criminal investigation further.

The fact that Defendant first proposed Ms. Escorza as a potential surety does not put Defendant's judgment or credibility in a positive light.  As noted, the record provides some basis to reasonably suspect that Ms. Escorza was at least knowledgeable about, if not involved in, the potential distribution of narcotics and/or money laundering.  Defendant at a minimum would have a basis to reasonably conclude that Ms. Escorza could be a witness in the prosecution of the charges against him.  Defendant's proposing Ms. Escorza as the first potential surety gives the Court pause particularly because Ms. Escorza has now fled to Honduras with his children.  The Court finds that the Defendant has demonstrated poor judgment and thus the Court cannot reasonably trust that the Defendant would exercise materially better judgment in complying with conditions of release.

Further, as noted, Ms. Escorza has a bank account into which significant sums of money have been deposited.  At the hearing, the Government confirmed that this bank account has not been seized or frozen.  It is unclear whether Defendant has access to that account, but should he have such access, that would provide further financial means to facilitate flight.

Finally with regard to family ties, it is undisputed that the Defendant has no family or other blood relations in the United States.  While Mr. Willis referred to the Defendant as "family," they are not related by blood or marriage and, as discussed further below, the Court finds that Mr. Willis and Defendant do not have a sufficiently close relationship to make Mr. Willis an appropriate surety in any event.

With regard to community ties and length of time in the community, the record is at best

1   unclear.  As noted, the Defendant was removed from the United States in January 2018 and it is

2   unknown when he returned to the United States, and uncertain when he returned to the Oakland area

3   in particular.  Defendant only reported residing in Oakland (without being able to provide any but

4   the most recent address for the last year) for about four years.  *See* Dkt. 23 at 1.  At the hearing, it

5   was represented that Ms. Escorza resided in Colorado until relatively recently, and so there is no

6   reliable evidence of Defendant's community ties or actual residence in the community prior to their

7   shared residence this past year.

8         With regard to his employment status, Defendant appears to have been employed in

9   construction for some period in the past, but he is presently unemployed.  *See id.* at 2.  Indeed, none

10  of the proposed sureties could testify as to how Defendant earned a living and all testified that they

11  never discussed work with him.

12        With regard to other past conduct and criminal history, Pretrial Services reports from

13  criminal records that the Defendant previously used three different aliases and one alternate date

14  of birth.  *See id.* at 4.

15        With regard to past conduct, the records indicate that the Defendant was previously removed

16  to Honduras from the United States in January 2018 due to his lack of legal status, yet obviously

17  reentered the United States.  *See id.* at 3.  The Ninth Circuit has held that the fact that a defendant is

18  an alien may be taken into account, but alienage does not by itself tip the balance either for or against

19  detention.  *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990).  The Court notes Arteaga's

20  immigration status and history of removal not because of Defendant's alienage, but rather to note

21  that Defendant has demonstrated a past ability to travel cross-border and to undertake actions which

22  he knew or should have known were contrary to law.  As discussed above, Defendant has incentive

23  to flee and motive to reunite with his children and significant other in Honduras, and the fact that

24  he has demonstrated an ability to travel across borders indicates that there exists a higher risk of

25  such flight.

26        With regard to prior criminal history and court appearances, the record indicates that on May

27  4, 2022 Defendant failed to appear at an arraignment in his criminal case in Alameda County

28  Superior Court and, as a result, a bench warrant in the amount of $60,000 was issued.  Defendant

United States District Court
Northern District of California

1    appeared at subsequent hearings in that case and posted a bond in the amount of $60,000.

2    In rebuttal to the Government, the Defendant argued that he would agree to even the most

3    stringent conditions of release, including location monitoring, curfew, unsecured bond, and other

4    conditions.  Given the fact that Ms. Escorza is no longer in her apartment in Oakland, Defendant

5    indicated he would agree to release to a halfway house.  Defendant argued that he posted a bond in

6    Alameda County Superior Court, that he made appearances at all but the first hearing in that case in

7    state court, and that he therefore demonstrated he is not a flight risk.

8    Further, Defendant argued that up to three proposed sureties were available to sign unsecured

9    bonds on his behalf.  As discussed above, there was a changing roster of potential co-sureties and

10   there was substantial time spent querying and interviewing Mr. Pena, Ms. Logsdon, and Mr. Willis.

11   As discussed, Defendant first proposed Ms. Escorza as a surety and, due to subsequent

12   events, withdrew Ms. Escorza as a proposed surety.  As detailed above, the Court finds that the

13   record raises serious doubts as to Ms. Escorza's suitability as a surety.

14   The Court finds that all three remaining proposed sureties (Mr. Pena, Ms. Logsdon, and Mr.

15   Willis) lack the kind of relationship with Defendant which would make them suitable sureties.  None

16   are family members of Defendant, and none are related to him by marriage.  None of them discussed

17   their finances with Defendant.  None of them knew details of Defendant's employment history,

18   details of how he earned a living, or details of his criminal history.  None of the proposed sureties

19   lived with or within walking distance of Defendant.  When asked, none of the proposed sureties

20   described Defendant as their "best friend" and none described the kind of regular one-on-one

21   interactions that are typical of the kind of close relationship which would be expected for an effective

22   surety.

23   Ms. Logsdon admitted to being closer friends with Ms. Escorza than  Defendant, and only

24   saw Defendant in group settings when Ms. Escorza or their children were present.  Ms. Logsdon is

25   not fluent in Spanish and admitted to not having deep or substantive conversations with Defendant.

26   The Government further noted that Ms. Logsdon has prior arrests but, according to Pretrial Services,

27   she has no criminal history.  *See* Dkt. 34 at 2.

28

ORDER OF DETENTION                           11

1   Mr. Willis admitted to getting to know Defendant because Ms. Escorza was his cousin –
2   however, he was only recently reunited with Ms. Escorza a few years ago and the two have not had
3   a long-term ongoing family relationship.  Mr. Willis has been unemployed for several months.  He
4   admitted that he has not attended events alone with Defendant, that Defendant has not met Mr.
5   Willis's mother or other family (other than Ms. Escorza), and that he came to know Defendant
6   because of Ms. Escorza's relationship with Defendant.  Mr. Willis admitted he knew of Defendant's
7   criminal history but did not "pry" into it with him, and similarly did not "pry" into Defendant's work
8   or how he made a living.  Mr. Willis has not discussed his finances with Defendant.  As noted,
9   Pretrial Services did not recommend Mr. Willis as a surety.  *See* Dkt. 29 at 3.  The Government
10  noted that Mr. Willis has a record of five arrests in California (from 2019 to 2023) and five arrests
11  in Illinois (from 2005 to 2010), and that Mr. Willis has multiple misdemeanor convictions, including
12  two for drug offenses.  *Id.* at 2.

13  Mr. Pena testified that he interacted with Defendant in group settings because Defendant's
14  children played with Mr. Pena's nephews.  Mr. Pena testified that he did not talk about work with
15  Defendant.  The Government noted that Mr. Pena has a criminal history of sixteen arrests from 2006
16  to 2022 and multiple convictions for various misdemeanors from 2009 to 2023.  *See* Dkt. 32 at 2.

17  Fundamentally, after having queried each of the proposed sureties, the Court finds that none
18  of the proposed sureties appear to be anything more than either friends-of-friends with Defendant
19  or to be one social friend among a larger group of friends or parents' group.  Accordingly, the Court
20  finds that the proposed sureties lack moral suasion over Defendant.

21  The purpose of having a surety is to help provide reasonable assurance that the Defendant
22  will fulfill their legal obligations and appear at all necessary court hearings if released on conditions.
23  *See, e.g.*, *United States v. Villalobos*, No. CR 00-40242 CW (WDB), 2005 WL 6127290, at *4 (N.D.
24  Cal. Feb. 17, 2005) ("Often, a surety bond is essential to delivering the reasonable assurances on
25  which defendants' entitlement to release turns.").  But here, where the proposed sureties lack
26  sufficiently close or personal relationships with the Defendant to provide that assurance, and where
27  the proposed sureties lack the ability to significantly impact or affect the Defendant's behavior, the
28  Court cannot find such reasonable assurances.  There are insufficient indicia that Defendant would

1  be substantially deterred from flight if these three proposed sureties were to actually sign on as

2  sureties.   And none of the proposed sureties indicated that they would actively help encourage

3  Defendant to appear at court hearings; by contrast all of them focused to varying degrees on their

4  desire to help reunite Defendant with his children.

5           Finally, none of the three proposed sureties have sufficient assets to support the bond

6  amount should Defendant violate conditions of release.  In essence, the bond would be an

7  uncollectable debt should the Defendant violate any condition of release.  The Court notes that

8  Pretrial Services has consistently recommended that Mr. Willis is not a suitable surety because he

9  is currently unemployed.  Further, the Court notes that the affidavit attached to the search warrant

10 submitted by the Government, particularly the facts therein as to Mr. Willis and his involvement in

11 the storage unit, raises at least some doubts as to Mr. Willis's suitability as a surety.  While the

12 Court is not rejecting the proposed sureties simply on the basis that they lack significant assets or

13 income, the Court notes that their inability to pay the bond amount in the event of a violation of

14 conditions undercuts the persuasiveness of the sureties to provide assurances that the Defendant

15 will appear if released on conditions.  Indeed, the fact that the proposed sureties refused to

16 undertake secured bonds demonstrates that there are limits to their willingness to help Defendant

17 and diminishes the ability of the bonds to influence the Defendant's behavior.

18          There is insufficient indication that imposing a bond on the three proposed sureties would

19 significantly address risk of flight.  Defendant Arteaga's residence was searched in May 2023, his

20 vehicle was searched on June 28, 2023, and his residence was against searched on November 29,

21 2023 (each time leading to a seizure of narcotics and large amounts of cash).  Defendant

22 presumably interacted with the three proposed sureties throughout this time frame, and yet he

23 never changed behavior.  The lack of moral suasion is further evident given all three proposed

24 sureties were at least equally close to Ms. Escorza, if not more so than they are to Defendant, and

25 yet none of them were in position to persuade Ms. Escorza to remain in the United States (or to

26 persuade her to return).

27          While the Court considered the feasibility of releasing the Defendant to a halfway house,

28 the halfway house does not sufficiently address or mitigate the Defendant's risk of flight.  Further,

ORDER OF DETENTION            13

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Pretrial Services has been checking space availability with the halfway house consistently and

2    there is currently a wait list.  Accordingly, release to the halfway house is not practicable or

3    feasible at this time anyway.  And as noted, the halfway house is only a structured environment

4    and cannot overcome the factors demonstrating risk of nonappearance discussed above.

5         In light of the facts discussed above, the Court finds that the proposed conditions do not

6    provide reasonable assurance that Defendant would appear as required.

7         The Government further argues that there are no conditions of release in this case which

8    would reasonably assure the safety of any other person or the community if the Defendant were

9    released.  While the Court finds that the Government has met its burden of proof with regard to risk

10   of flight, the Court addresses the issue of danger to the community briefly.

11        First, the Government argues that the Defendant poses a danger to the community because

12   of the large quantity of fentanyl seized during the searches of his residence and automobile.  *See*

13   Dkt. 24 at 2.  The Government argues that fentanyl is such a dangerous narcotic due to overdose

14   deaths generally in San Francisco that this factor suffices to detain based on dangerousness,

15   particularly because Defendant "is more than a street dealer"  *Id.*  However, not all (or even any

16   quantifiable number) of overdose deaths in San Francisco (which are of course tragic) are attributed

17   to this Defendant.  If the Government's argument were correct, then it is difficult to discern how

18   most defendants charged with fentanyl distribution would avoid detention.

19        The Government also argues that, as averred in the search warrant affidavit, a juvenile was

20   referred to in text messages between Ms. Escorza and Defendant with regard to the delivery of

21   narcotics from the storage unit to Arteaga.  The Government argued at the detention hearing that the

22   involvement of a juvenile in the accused narcotics distribution demonstrates that Defendant poses a

23   risk of danger to others or the community.  However, the facts averred in the search warrant affidavit

24   indicate it was Ms. Escorza, not Defendant, who instructed the juvenile and she was the one who

25   got the juvenile involved.  Accordingly, there is insufficient evidence in the record to show that

26   Defendant was responsible for the involvement of the juvenile in the first instance.

27        The Court is not persuaded on the record in this case that the Government can meet its burden

28   of proof of dangerousness by clear and convincing evidence as to this Defendant, but the Court need

1  not reach a different conclusion on detention because of the Court's finding on risk of flight.

3  **CONCLUSION**

4  The Court has considered all evidence and arguments presented and has also given due

5  consideration to the recommendation of U.S. Pretrial Services in this case.  These findings are

6  made without prejudice to the Defendant's right to seek review of Defendant's detention, or to file

7  a motion for reconsideration if circumstances warrant reopening the detention hearing.  *See* 18

8  U.S.C. § 3142(f).

9  For the reasons stated on the record at the sessions of the detention hearing and for the

10  reasons as further stated herein, the Defendant was (at the conclusion of the January 12, 2024

11  hearing) remanded into the custody of the United States Marshal.  Pursuant to 18 U.S.C. § 3142(i),

12  **IT IS ORDERED THAT**:

13  1.  The Defendant be, and hereby is, committed to the custody of the Attorney General

14  for confinement in a corrections facility separate, to the extent practicable, from persons awaiting

15  or serving sentences or being held in custody pending appeal;

16  2.  The Defendant be afforded reasonable opportunity for private consultation with

17  counsel; and

18  3.  On order of a court of the United States or on request of an attorney for the

19  Government, the person in charge of the corrections facility in which the Defendant is confined

20  shall deliver the Defendant to an authorized United States Marshal for the purpose of any

21  appearance in connection with a court proceeding.

22  **IT IS SO ORDERED.**

24  Dated:  January 16, 2024

PETER H. KANG
United States Magistrate Judge